J-S09017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HANEEF TUCK | : | |
| | : | |
| Appellant | : | No. 816 EDA 2023 |

Appeal from the Judgment of Sentence Entered July 22, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004493-2015

BEFORE:  PANELLA, P.J.E., NICHOLS, J., and BECK, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED JULY 17, 2024**

Appellant Haneef Tuck appeals *nunc pro tunc* from the judgment of sentence imposed following his convictions for aggravated assault, burglary, two counts of both robbery, and conspiracy.[1]  Appellant argues that the verdict was against the weight of the evidence, challenges the discretionary aspects of his sentence, and contends the trial court provided an incorrect jury instruction.  Following our review of the record, the parties' briefs, and the trial court's analysis of Appellant's issues, we affirm based on the trial court's opinion.

_____

[1] 18 Pa.C.S. §§ 2702(a)(1), 3502(a)(3), 3701(a)(1)(i) and (iii), and 903, respectively.

The relevant facts and procedural history of this matter are well known to the parties. **See** Trial Ct. Op., 8/30/23, at 1-21. Briefly, a prior panel of this Court summarized the history of this case as follows:

On March 28, 2015, [Appellant] was arrested and charged with various offenses in connection with the burglary of a Philadelphia tattoo parlor, owned by one of the victims. [Appellant] and three other perpetrators forcibly entered the premises, shot one of the victims in the hip, took his clothes and money, and stole his black iPhone 6 and an iPad. Another victim was beaten, stripped of his clothes, and also robbed of his money and wallet. The four perpetrators fled the scene. Video surveillance at SugarHouse Casino, where the victims had been gambling prior to returning to the tattoo parlor, revealed [Appellant] and his co-defendant, Aaron Brunson, at the casino talking to the victims and leaving in Brunson's silver Jeep shortly after the victims left the casino in a cab. One of the victims positively identified [Appellant] as one of the men from the casino in a photo array.

* * *

Following a three-day jury trial, [Appellant] was convicted of aggravated assault, robbery—inflict serious bodily injury, burglary, theft by unlawful taking—movable property, conspiracy to commit robbery, and robbery—threat of immediate serious injury. After a hearing, and considering a pre-sentence investigation report, the court sentenced [Appellant] to an aggregate sentence of 25-50 years' incarceration. [Appellant] filed a direct appeal challenging the discretionary aspects of his sentence and the effectiveness of trial counsel for failing to object to the consecutive nature of his five sentences or to file a motion to reconsider his sentence. Our Court affirmed [Appellant's] judgment of sentence on August 5, 2019, concluding that counsel "failed to preserve [Appellant's] sentencing claims by [either] objecting at the sentencing hearing or [by] filing a post-sentence motion [and that the ineffectiveness] claims [were] unreviewable on direct appeal." **Commonwealth v. Tuck**, 2546 EDA 2016, [2019 WL 3545454, at *2] (Pa. Super. filed Aug. 5, 2019) (unpublished memorandum) [(**Tuck I**)]. [Appellant] filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which was denied on February 10, 2020.

> [***Commonwealth v. Tuck***, 464 EAL 2019, 224 A.3d 1092 (Pa. Feb. 10, 2020) (***Tuck II***)].

***Commonwealth v. Tuck***, 1550 EDA 2021, 2022 WL 4126858, at *1 (Pa. Super. filed Sept. 12, 2022) (unpublished mem.) (some formatting altered and footnotes omitted) (***Tuck III***).

Appellant subsequently filed a timely Post Conviction Relief Act[2] (PCRA) petition, which the PCRA court denied. On appeal, this Court reversed the PCRA court's order and remanded for the reinstatement of Appellant's right to file post-sentence motions *nunc pro tunc*. ***See Tuck III***, 2022 WL 4126858, at *1, *3. Thereafter, Appellant filed timely post-sentence motions *nunc pro tunc*, which were denied by operation of law. ***See*** Order, 3/3/23. Appellant filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement.[3] The trial court issued a Rule 1925(a) opinion addressing Appellant's claims.

_____

[2] 42 Pa.C.S. §§ 9541-9546.

[3] Pursuant to Pa.R.Crim.P. 720(B)(3)(a), a trial court must rule on a post-sentence motion within 120 days of its filing. If the trial court fails to do so, the clerk of courts shall issue an order denying the motion by operation of law, and the defendant must file a notice of appeal within thirty days. ***See id.***; ***see also*** Pa.R.Crim.P. 720(A)(2)(b). Where the clerk of courts issues a premature order denying a defendant's post-sentence motion by operation of law before the 120-day deadline, it may constitute a breakdown in court processes and excuse an otherwise facially untimely appeal. ***See Commonwealth v. Rodriguez***, 174 A.3d 1130, 1138-39 (Pa. Super. 2017). In the instant case, Appellant filed a timely post-sentence motion *nunc pro tunc* on November 13, 2022. The 120th day following that date was Monday, March 13, 2023. However, the clerk of courts entered the order denying the post-sentence motion by operation of law on March 3, 2023, which was fewer

*(Footnote Continued Next Page)*

On appeal, Appellant raises the following issues:

1. Whether the verdict was against the weight of the evidence.

2. Whether Appellant's sentence was unduly harsh and excessive.

3. Whether [the trial] court erred in giving an incorrect jury instruction.

Appellant's Brief at 9 (formatting altered).

The trial court thoroughly addressed Appellant's claims and concluded that he was not entitled to relief. **See** Trial Ct. Op. at 21-34. Therefore, after careful consideration of the record, the parties' arguments, and the trial court's conclusions, we affirm on the basis of the trial court's opinion. **See id.**

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/17/2024

_____

than 120 days after the motion was filed and is in contravention of the Pennsylvania Rules of Criminal Procedure. In any event, Appellant filed a timely notice of appeal on March 17, 2023, which was within thirty days of the date of the order denying his post-sentence motion by operation of law. Accordingly, we conclude that Appellant's notice of appeal was timely. **See** Pa.R.A.P. 903(a).

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CRIMINAL TRIAL DIVISION**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | **CP-51-CR-0004493- 2015** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| | : | **SUPERIOR COURT** |
| **HANEEF TUCK** | : | **NO. 816 EDA 2023** |

**FILED**

**COYLE, J.**          AUG 2 9 2023          **AUGUST 30, 2023**

Appeals/Post Trial
Office of Judicial Records

**O P I N I O N**

Peter A. Levin, Esquire, on behalf of Appellant/Petitioner, Haneef Tuck, has filed an appeal of this Court's order denying his post-sentence motion.

## I. **PROCEDURAL HISTORY**

The underlying charges stem from the March 28, 2015 arrest of Appellant, Haneef Tuck, for his involvement in the gunpoint robbery of complainants Kasheef Murray and Isaiah Brown on February 27, 2015 at Mr. Murray's tattoo parlor located at 1932 N. 31ˢᵗ Street, Floor 1 in the City and County of Philadelphia. After the preliminary hearing, arraignment, and scheduling conferences, the case was scheduled for a joint jury trial with co-defendant Aaron Brunson before the Honorable Anne Marie B. Coyle on May 16, 2016. At trial, Appellant was represented

1

by James Marsh, Esquire, Mr. Brunson was represented by Joseph Santaguida, Esquire, and the Commonwealth was represented by Assistant District Attorney, Tanner Rouse, Esquire

Over the course of the jury trial, the Commonwealth presented overwhelmingly convincing direct and circumstantial evidence -- including hospital records, property receipts, interviews with complainants and co-defendants, surveillance footage, phone records, officer testimony, as well as expert opinion testimony from cellular telephone analysis specialists.

After the Commonwealth rested its case-in-chief, the charged co-defendant Aaron Brunson testified incredibly as to his version of events and denial of providing a post-Miranda statement of admission to the assigned investigator. The Commonwealth responded with credible rebuttal testimony and physical evidence from the assigned investigator. Closing arguments were made on May 19, 2016 and the jury returned the following day with a verdict. Appellant was found guilty of: (1) Aggravated Assault, under 18 § 2702 §§ A1, graded as a Felony of the First Degree (victim Kasheef Murray); (2) Robbery- Inflict Serious Bodily Injury, under 18 § 3701 §§ A1I, graded as a Felony of the First Degree (victim Kasheef Murray); (3) Burglary- Not Adapted for Overnight Accommodation, under 18 § 3502 §§ A3, graded as a Felony of the First Degree (victim Kasheef Murray); (4 and 5) Two counts of Conspiracy- Robbery, under 18 § 903, graded as a Felony of the First Degree (victim 1 Kasheef Murray, victim 2 Isaiah Brown); (6) Robbery- Threat of Immediate Serious Injury, under 18 § 3701 §§ A1II, graded as a Felony of the First Degree (victim Isiah Brown). The jury rendered similar verdicts as to co-defendant Aaron Brunson.

As the presiding trial judge, this Court, the Honorable Anne Marie B. Coyle directed the completion of Presentence Evaluations and Mental Health Evaluations by the First Judicial District Probation and Parole Department and scheduled the sentencing hearing in due course for

July 22, 2016. After review of all completed presentence reports and consideration of all relevant data submitted concerning the Appellant at a full and fair sentencing hearing, this Court imposed the following sentences:

> Count 1: Aggravated Assault- Minimum five (5) years state term incarceration to Maximum ten (10) years of incarceration;
> Count 2: Robbery-Inflict Serious Bodily Injury- Minimum five (5) years state term incarceration to Maximum ten (10) years of incarceration, to run consecutively to count 1;
> Count 3: Burglary- Minimum five (5) years state term incarceration to Maximum ten (10) years incarceration, to run consecutively to count 2;
> Count 8: Conspiracy-Robbery- Minimum five (5) years state term incarceration to Maximum ten (10) years incarceration, to run consecutively to count 3;
> Count 13: Conspiracy-Robbery- Minimum five (5) years state term incarceration to Maximum ten (10) years of incarceration, to run concurrently with count 8;
> Count 15: Robbery-Threat of Serious Immediate Injury- Minimum five (5) years state term incarceration to Maximum ten (10) years of incarceration, to run consecutively to count 8.

The resulting aggregate sentence was a minimum period of confinement of twenty-five (25) years state incarceration to a maximum period of confinement of fifty (50) years, with credit given for time served. The Appellant was ordered to have no contact with either of the complainants, and parole conditions including random drug and alcohol testing and random home visits were imposed. Appellant did not file any post-sentence motions.

On August 9, 2016, James Marsh, Esquire, filed a Notice of Appeal to the Superior Court on behalf of Appellant. On August 18, 2016, this Court directed Attorney Marsh, to file a concise Statement of Errors Complained of on Appeal. On November 6, 2016, Attorney Marsh was permitted to withdraw as counsel, and David Walker, Esq. was appointed as appellate counsel. On November 4, 2016, a concise Statement of Errors was filed on behalf of Appellant which raised the following claims:

1. The trial court abused its discretion in imposing consecutive sentences;
2. There was insufficient evidence to support Defendant's convictions;
3. The court gave insufficient, contradictory, and prejudicial jury instructions; and
4. Defendant was provided ineffective assistance of counsel.

On June 12, 2018, this Court filed an Opinion responding to Appellant's Statement of Errors. On August 5, 2019, the Superior Court of Pennsylvania- Eastern District filed the appellate Opinion affirming the Judgement and Sentencing Order of the trial court and finding that Appellant's claim concerning the discretionary aspects of his sentence was waived and his claim challenging the effectiveness of counsel was unreviewable on direct appeal. On September 4, 2019, a Petition for Allowance of Appeal was filed with the Supreme Court of Pennsylvania and on February 10, 2020, the Supreme Court of Pennsylvania denied the Petition.

On June 9, 2020, Appellant filed a *pro se* petition pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. On July 14, 2020, Peter A. Levin, Esquire was appointed and entered his appearance as counsel. An amended counseled PCRA petition was filed on November 11, 2020. On March 1, 2021, the Commonwealth motioned to dismiss Appellant's PCRA petition. On May 12, 2021, this Court filed a notice of dismissal of Appellant's PCRA under Pennsylvania Rule of Criminal Procedure 907. On July 8, 2021, this Court filed a formal Order of Dismissal in response to Appellant's PCRA. Appellant filed a timely Notice of Appeal to the Superior Court on July 19, 2021, and on July 22, 2021, this Court ordered Appellant to file a 1925(b) Statement of Matters Complained of on Appeal.

On August 5, 2021, Appellant filed a timely counseled 1925(b) Statement in which he specifically alleged the following:

The court was in error in denying the PCRA for the following reasons:

1. Appellate counsel was ineffective for failing to appeal issues.
   1. Counsel did not present the Pennsylvania Superior Court with the issue of the verdict being against the weight of the evidence.
   2. Counsel did not present the Pennsylvania Superior Court with the issue of an incorrect jury instruction.
B. Trial counsel was ineffective for failing to file a post sentence motion to reconsider sentence.
C. Trial counsel provided ineffective assistance for advising Petitioner not to testify

4

D. Trial counsel was ineffective for failing to investigate and interview witnesses.

E. Petitioner is entitled to a new trial based on the newly discovered evidence that would likely change the outcome of the present case.

The PCRA court was in error not granting an evidentiary hearing.

The PCRA court was in error in not allowing the defendant *nunc pro tunc* reinstatement of his rights to file post-sentence motions and a direct appeal in that the Commonwealth agreed to this.

On September 12, 2022, the Superior Court reversed and remanded for the reinstatement of Appellant's right to file post-sentence motions *nunc pro tunc*.

On November 8, 2022, Appellant's PCRA petition was granted limited to his right to file a post-sentence motion within 10 days. Attorney Levin filed a post-sentence motion on Appellant's behalf on November 13, 2022. On March 3, 2023, the motion was denied by operation of law. On March 17, 2023, a timely Notice of Appeal was filed. A Statement of Errors Complained of on Appeal, pursuant to Pa. R.A.P. Rule 1925 (b) was ordered by this Court on April 28, 2023. That Statement was filed on May 15, 2023.

## II. **STATEMENT OF FACTS**

The Commonwealth of Pennsylvania soundly established beyond a reasonable doubt that in the early morning hours of February 27, 2015, the jointly tried defendants, Aaron Brunson, and Haneef Tuck, and two other males had forcibly entered a tattoo parlor located in the first-floor apartment at 1932 N. 31st Street and robbed tattoo business owner Kasheef Murray and his friend Isaiah Brown. Both victims had just entered the premises after they had travelled there in a cab from the Sugar House Casino where they had been playing over several hours beginning the night before the robbery. Three of the perpetrators wore some handkerchief masking to hide their faces and all four men were reportedly armed with guns.

During the course of the robbery, Mr. Murray was shot once in the hip by one of the masked men, forcibly stripped of his clothing, including his pants, and had his gambling winnings of $750.00, a black iPhone 6, and an iPad taken from him. Isaiah Brown was beaten,

5

stripped of his clothing and reported having his black leather wallet and his gambling winnings removed from him as well. Mr. Murray was transported with Isaiah Brown by an upstairs neighbor to nearby Temple Hospital for immediate emergency treatment for his gunshot wound.

Both victims reported to the police officer who had responded to the hospital that during the robbery the gunmen continually threatened them to give up the gambling winnings that they had won the preceding evening they had been at the Sugar House Casino located at 1001 North Delaware Avenue, Philadelphia PA 19125. The references to the gambling winnings suggested that the perpetrators had been with the victims earlier at the Sugar House Casino and followed them to their final destination. The victims had been playing at the Sugar House casino along with both jointly tried defendants and two other men.

Despite the lack of cooperation from the victims, particularly Isaiah Brown, who had a prior friendly relationship with both defendants tried before the jury, an impressive collaborative investigation was conducted by Philadelphia Detectives predominantly from Central Detective Division, uniformed police officers from North Philadelphia, Center City and South Philadelphia along with personnel from the Sugar House Casino. Video surveillance tapes from cameras that had been positioned from different areas within the Sugar House Casino and just outside the complex in the valet parking sections areas were displayed to the jury. These combined videos demonstrated that both during multiple hours preceding the robbery, complainants Mr. Murray and Isaiah Brown had been gambling at tables accompanied by Appellant, Aaron Brunson (Appellant's co-defendant at trial) and two other men later identified, but not arrested.

Surveillance footage supplied by Sugar House Casino had shown that co-conspirators Aaron Brunson and Haneef Tuck had continually spoken to both victims in the casino's valet

area and had waited for them to leave the casino. The video also showed Brunson and Tuck in the parking lot just outside of the Sugar House Casino in a silver Jeep automobile. Two other co-conspirators were also depicted in the footage driving from the same parking area in a second vehicle. Aaron Brunson was subsequently stopped by law enforcement in the depicted Jeep which had been registered to him on the date of his arrest. The wallet and identification from victim Isaiah Brown that had been reported stolen in the robbery was recovered from Brunson's Jeep following execution of a duly authorized Search and Seizure Warrant.

At trial, cellular telephone site tower data and expert analysis was introduced to demonstrate the physical movements of both Aaron Brunson and Appellant Haneef Tuck via their use of the cellular telephone that had been registered to each of them. Their use of voice calls and text messages during the relevant time periods consistently tracked their travel route from the Sugar House Casino to the area where the victims were robbed and then back again to their residences in South Philadelphia.

In addition, real time crime outside video footage was also played for the jury and introduced into evidence that displayed the movements of the same two vehicles that had been seen earlier driven by the perpetrators in front of Sugar House Casino. The jury in an obstructed manner observed that video which showed the vehicles circling and parking within a block radius of Mr. Murray's tattoo parlor just before the armed robbery. This real time crime video also depicted an individual who had a remarkably similar stature to Arron Brunson's heavy build and stature, peering around the corner building at the end of the victim's block and motioning to others to join him just before the four men kicked in the door and invaded the tattoo parlor.

Specifically, at trial, the Commonwealth called uniformed Philadelphia Police Officer Patrick Heron to establish that on the morning of February 27, 2015, he had responded to a radio

7

call directing him to the Temple Hospital Emergency Room. Upon his arrival, Officer Heron greeted complainant Kasheef Murray, who was in stable condition at that time but had been admitted for treatment of a gunshot wound on his left hip. (N.T. 5/17/16, pp. 59-61). Officer Heron testified that while he was at the hospital, Mr. Murray excitedly explained what had happened to him and Isaiah Brown as follows:

> **OFFICER HERON**: "He told me that... he was at the casinos earlier. And after the casinos, him and his buddies went to a tattoo parlor on North 32nd Street to chill out afterwards...While inside there he, all of a sudden, heard several kicks at the front door. Next, he stated that the front door opened up. Four black males armed with guns entered. They had red and white shirts on their face. One of the black males said, "Give up your winnings. Give up the money you won at the casino." Next thing that Mr. Murray knew, he heard a gunshot. He told me that the one male stole cash from him and an iPhone and an iPad -- iPod, I believe."

*Id.* at 61. After Officer Heron interviewed Mr. Murray, he filed an initial incident report and gave a follow-up statement to detectives relaying the information he received during the interview. *Id.*

When the Commonwealth called complainant Murray to the stand at trial, he demonstrated from the outset that he was a fearful and hostile witness to the prosecution; he selectively feigned loss of memory of relevant events and identifications of Haneef Tuck and Aaron Brunson. He acknowledged that after he was shot, terrorized and robbed, he had moved well away from the city and disengaged himself from fellow victim Isaiah Brown. On the stand, Mr. Murray materially contradicted previous statements that he had provided to the responding police officer at the hospital, to the assigned investigator Detective Michael Rocks, and his sworn testimony that he had provided to an earlier indicting grand jury. After his hostility to the prosecution was soundly established, Mr. Murray's previous inconsistent statements were properly introduced via cross examination and substantively through additional witnesses.

8

At trial, Mr. Murray admitted that during the evening of February 26, 2015 he had taken a taxi with his friend Isaiah Brown to the Sugar House Casino on Delaware Avenue just below Center City in Philadelphia. Mr. Murray recalled playing at the blackjack tables while Mr. Brown played poker and engaged in other forms of entertainment until the early hours of the next morning. Mr. Murray also remembered that he and Isaiah Brown had each won between $700 and $1,000 before leaving in a cab and traveling to his tattoo shop located near the intersection of 31ˢᵗ and Berks Streets in Philadelphia around four o'clock in the morning.

Kasheef Murray recollected that once he and Isiah Brown had arrived at the tattoo shop, they began to chill out or relax. This calm period had been quickly interrupted when four armed men, three of whom were masked, kicked in the door and stormed into his shop. Kasheef Murray testified that he had been shot "within the first five seconds" after the front door of his premises had been repeatedly kicked, and that his money, phone, tablet, and Diesel watch were stolen from him as he was stripped of his clothing. He also recalled seeing fellow victim Isaiah Brown robbed, beaten and stripped of his clothing and possessions as well.

At trial, however, Mr. Murray testified that he did not recognize any of the four individuals that had robbed and shot him and claimed that he had never identified anyone as a perpetrator at any earlier proceeding. He would not even look in the direction of the defendants seated next to their counsel. Mr. Murray reluctantly admitted to being brought to the hospital for treatment of his gunshot wound by an upstairs neighbor immediately after the incident transpired. He claimed that he only vaguely recalled speaking with a uniformed Philadelphia police officer while he was in the emergency room. Mr. Murray stated that he did not remember ever speaking to any subsequent investigator including the assigned detective who had recorded his verbatim statement after he left the hospital. This denial of interaction continued despite

9

being presented with a complete copy of his signed and dated statement. (N.T. 5/17/16, pp. 76-87).

The Commonwealth was duly permitted to cross-examine this hostile witness and to present his previously recorded interview. Detective Michael Rocks read aloud Kasheef Murray's fully signed, recorded, and reviewed verbatim interview as a prior inconsistent statement. During the interview, Detective Rocks had asked Mr. Murray what had happened when he and Isaiah Brown had arrived at 1932 North 31st Street after leaving the Sugar House Casino, to which Mr. Murray had answered:

> "We were just talking about how we won money at the casino. Isaiah was counting his money and taking pictures of his money. He was enjoying having that money in his hands. While he was counting his money, we heard someone banging on the door. It didn't seem like someone was knocking on the door. It seemed like someone was trying to kick the door down. Seconds later, there were four guys in the tattoo shop with guns. They were saying that they were going to kill us if we didn't give them the money that we just won."

(N.T. 05/17/16, p. 93).

Although Mr. Murray denied having any knowledge whatsoever of this interview at trial, he affirmed that it was his signature that had appeared at the bottom of every page of the interview. (N. T. 05/17/16. p. 88). Mr. Murray also denied having knowledge of his subsequent encounter with Philadelphia detectives wherein he had been shown various pictures of individuals and was asked if anyone was involved in the robbery. However, assisting investigator Detective Edward Keppol from Central Detective Division testified that on March 12, 2015, he had displayed for Mr. Murray a series of photographs and that Mr. Murray had labeled the image of (Appellant) Haneef Tuck as "one of the guys from the casino." Mr. Murray was confronted with his writing on the same photograph that depicted his identification of Haneef Tuck as one of the perpetrators. (N. T. 05/17/16, p. 107).

10

At trial, Mr. Murray additionally denied remembering that he had ever appeared to testify under oath in front of an indicting grand jury on April 14, 2015. (N. T. 05/17/16, p. 110). Mr. Murray was confronted with the transcribed record of his previously sworn testimony at that hearing. The transcribed record reflected that Mr. Murray had testified under oath before the indicting grand jury and recited events without any hesitation and had implicated both Aaron Brunson and Appellant Haneef Tuck. At that grand jury hearing, Mr. Murray had also established the preceding link of friendly familiarity between his fellow victim Isaiah Brown and both Defendants and playful interactions while they were at the casino.

At that grand jury hearing, when asked by the prosecutor whether Mr. Murray had seen anyone speak with or approach Isaiah Brown while they were at the casino, he had replied, "Yes. I had went to go. After we came back up, I went to go get some food because we was there for hours. When I came back, Zay was at the table helping somebody else." (*Id.* at 114). Mr. Murray also testified before the grand jury that the individuals who had been talking to Isaiah Brown, whom he had referred to as "Zay," had asked Mr. Brown if he would ride back to South Philadelphia with them, but Mr. Brown chose to go with Mr. Murray to his tattoo shop instead. (*Id.* at 116).

Mr. Murray had also relayed to the grand jury that "about ten minutes" after he and Isaiah Brown had arrived at the tattoo shop, there was a "bang on the door" and that four men entered, three masked and one unmasked, and "within seconds of them being there" Mr. Murray was shot. (*Id.* at 117-18). Before the grand jury, Mr. Murray stated again that the perpetrators demanded his and Isaiah Brown's casino winnings. (*Id.* at 119). However, at trial, Mr. Murray held his head down for the most part of his testimony and retreated to answering most inquiry with "I don't recall." (N.T. 5/17/16, pp. 70-134).

11

To establish the identity and geographic travel of the culprits through analysis of the use of charged defendants' respective cellular telephones, City of Philadelphia Central Detective Anthony Vega was called to testify as an expert witness. He provided his acknowledged expert opinion concerning historical cell site data analysis based upon his extensive training and position on the Cellular Analysis Survey Team assigned as a task officer with the Federal Bureau of Investigation. Detective Vega related that he had examined date, time and site data extrapolated from the cellular telephones possessed and registered to Defendant Haneef Tuck and Defendant Aaron Brunson and compared that information with the tower list provided by the cellular service providers.

Based on that information, he determined that during the relevant time period both Defendants' phones had traveled to and from the tower locations closest to the Sugar House Casino, along the corridor toward the victim's destination and then returned to the same general vicinity in South Philadelphia where both Defendants had been living prior to the shooting and robbery. (N.T. 5/18/16, pp. 15-23).

Uniformed Philadelphia Police Officer Jayson Troccoli who had been regularly assigned as a patrolman in South Philadelphia testified that he had recognized both Appellant Haneef Tuck and Aaron Brunson within the Sugar House Casino video surveillance footage. He related that prior to the arrest of anyone, he had been shown the video by the assigned investigator Detective Rocks, to see if he had recognized any of the players from his regular work in South Philadelphia neighborhoods. Officer Troccoli testified that he had easily recognized both Aaron Brunson and Haneef Tuck because he had observed both men "frequently" in that area. In fact, he had recalled recently stopping Aaron Brunson for a traffic violation as he was driving a silver Jeep Cherokee, a vehicle similar to the one depicted in the parking lot footage. (*Id.* at 48). After

12

Officer Troccoli had initially identified the perpetrators in the video to the investigator, he had been instructed to look for that silver Jeep Cherokee in South Philadelphia.

Officer Troccoli subsequently located Aaron Brunson's silver Jeep Cherokee on the 1800 block of McClean Street, in South Philadelphia near Aaron Brunson's recorded residence. Officer Troccoli had observed Mr. Brunson get into the driver's seat of the Jeep Cherokee and followed him in an unmarked vehicle. After stopping the vehicle, Officer Troccoli brought Aaron Brunson to Central Detective Division and held the Jeep Cherokee until a search warrant was obtained. *Id.*

City of Philadelphia Detective Michael Rocks testified in his capacity as a member of the Special Investigations Unit of the Central Detectives, that he had been assigned as the lead investigator of the shooting and robbery of Kasheef Murray and the related robbery of Isaiah Brown. He related that on February 27, 2015, he had initially interviewed victim Kasheef Murray in the office of the Central Detectives. He recalled that at the time of the interview, there were no suspects in mind.

Detective Rocks testified that Mr. Murray revealed to him that during the robbery at least one of the gunmen had asked, "Where's the money you won?" This information confirmed for the Detective that the offenders must have had knowledge of the complainants' presence and success at the casino earlier that night. This had inspired Detective Rocks to retrieve the video surveillance footage from that night at Sugar House Casino.

When the video surveillance was played for the jury, Detective Rocks simply guided the jury's attention to the visible details. This included the portions wherein the complainants, Kasheef Murray and Isaiah Brown, as well as both charged defendants, Haneef Tuck and Aaron Brunson, were observed gambling together at the blackjack table. This video also displayed the

complainants and both Defendants with the two other men walking from the gambling area to a hallway by the elevators or exits toward valet parking. All relevant activities and persons were viewed by the jury without obstruction. Detective Rocks merely directed the attention of the jury to those relevant portions largely without objection on behalf of either Defendant on trial. The authenticity of those video recordings supplied from the Sugar House Casino had been entered by stipulation between all parties.

Following the showing of footage from inside the casino, the Commonwealth played the corresponding video recordings depicting the exit of the victims and defendants from valet and parking areas outside the casino. That footage displayed Aaron Brunson and Haneef Tuck conversing with both complainants and getting into a silver Jeep Cherokee that had been parked in the lot. This footage further showed the silver Jeep Cherokee strangely pulling over and idling in an overflow parking lot while the complainants hopped into one cab, and then get out of the first cab and get into another cab. As Detective Rocks noted from his familiarity with the location, the Defendants had been positioned in the parking lot in a manner that provided them a vantage point of the complainants' movements.

Detective Rocks explained his course of actions during the investigation. He stated that after he had initially viewed the casino footage, he had contacted uniformed police in South Philadelphia because that was where victim Isiah Brown had reported to be living. He was present when Officer Troccoli and Officer Gormley, both unformed police officers familiar with South Philadelphia, recognized both Aaron Brunson and Haneef Tuck in the video footage. After the defendants were identified in the video's footage for Sugar House Casino, Detective Rocks obtained the real time crime video feed from the time period of the robbery retrieved from the

14

law enforcement camera that had been positioned at the intersection of 31st and Berks Streets, which was approximately half a block from the crime scene.

Detective Rocks recognized the silver Jeep Cherokee previously depicted in the Sugar House Casino parking lot within the footage from 31st and Berks approximately fifteen minutes after the Defendants had been seen leaving the casino and recognized the person matching Aaron Brunson's clothing and build description, arrest and search warrants were obtained for Haneef Tuck and Aaron Brunson as the primary suspects of the instant shooting and robbery. (N.T. 5/18/16, pp. 63-91).

After a search warrant was authorized for the stopped silver Jeep Cherokee, Detective Rocks, along with other Philadelphia police officers, searched the vehicle and found Isaiah Brown's wallet, which contained his identification, as well as a temporary pink slip registration for the vehicle, confirming that Aaron Brunson was the automobile's owner. Detective Rocks subsequently interviewed Aaron Brunson, wherein Mr. Brunson waived his Constitutional rights and provided the detective with a detailed signed and written statement confessing his complete complicity in the crimes at issue along with naming his co-defendant Haneef Tuck, and two other individuals who have yet to be arrested or located as co-conspirators.

During the presentation of the Commonwealth's case in chief, Detective Rocks read the statement of admission provided by Aaron Brunson in a format with redaction of all references to the co-defendant on trial Haneef Tuck. In his statement, Mr. Brunson essentially admitted to playing at the Sugar House Casino with the complainants and others, following the victims in his Jeep with at least one other person, awaiting the arrival of two other men to the block in their vehicle before kicking in the door of the tattoo shop. He heard a co-conspirator shoot Kasheef Murray while he and three other men demanded the victims' casino winnings, rifled through

15

pockets after both victims had been stripped of their clothing, and rifling through drawers to search for valuables. (N.T. 5/18/16, pp. 91-112).

After the Commonwealth rested and this Court conducted a full colloquy, the jointly tried co-defendant Aaron Brunson testified that he had been at Sugar House Casino in the early morning hours of February 27, 2015 with the victims. He confirmed that he had met his charged co-defendant Haneef Tuck while still at the casino and consistently identified all relevant persons in the video. He recalled that he and victim Isaiah Brown with whom he had been friendly having grown up in the same South Philadelphia neighborhood, played at the same blackjack table.

During his testimony, Brunson was shown the surveillance footage from the casino and admitted to owning and driving the silver Jeep Cherokee depicted. He also affirmed ownership and continued possession of one of the cellular telephones assigned to the number that had been used to triangulate the location and travel of the perpetrators. However, despite being directly confronted with firm data that his cell phone had been utilized in geographical areas consistent with travel from the Sugar House Casino, and to and from the crime scene, Aaron Brunson incredibly testified that he had merely went to the Sugar House Casino and then went directly home with Haneef Tuck in South Philadelphia on the night of the crime.

Moreover, at trial Aaron Brunson apparently suffered a memory lapse concerning any admission to his participation in the crimes at issue that he had provided to Detective Rocks. When presented with a copy of the previously redacted version of his detailed admission of complicity to the crimes at issue, Mr. Brunson denied that he had ever spoken to the Detective and any claim that the written signatures of his name that appeared at the bottom of each page of

16

the statement had not been written by him. He further asserted that following his arrest he had been kept in a cell all-night and refused to talk to the police.

When asked at trial if he knew how victim Isaiah Brown's wallet had gotten in his Jeep, Aaron Brunson surmised that since the two had lived in the same neighborhood, Mr. Brown's wallet must have fallen out of Mr. Brown's pants and into his vehicle at some unknown time. (N.T. 5/19/16, pp. 13-38). Haneef Tuck, by and through his trial counsel was provided full opportunity to cross-examine co-defendant Aaron Brunson. In response to Aaron Brunson's poorly crafted testimony, the Commonwealth introduced the original non-redacted form of Aaron Brunson's statement of admission given to the assigned investigator Detective Michael Rocks as an inconsistent statement to this trial testimony. Haneef Tuck, by and through his trial counsel was provided full opportunity to cross-examine this rebuttal witness.

In sum, the Commonwealth had concretely proved that on February 26, 2015, Appellant Haneef Tuck, and his co-defendant Aaron Brunson, had been gambling together at the Sugar House Casino where they had opportunistically, observed over several hours, the winning gambling efforts of complainants Isaiah Brown, whom they had been friendly with from their South Philadelphia neighborhood and Kasheef Murray, a person previously unknown to them. After witnessing the complainants win money at the casino, Brunson and Tuck jumped into Brunson's silver Jeep Cherokee while the other two males jumped into a another vehicle, circled the parking lot area and left following the complainants' cab before traveling with their cell phones to Mr. Murray's tattoo parlor located in the first floor apartment at 1932 N. 31ˢᵗ Street, Philadelphia. When the Defendants arrived at the shop, three out of the four males wore handkerchief masks to cover portions of their faces, and all armed themselves with guns.

The four men, all armed with handguns, forcibly entered the first floor apartment of the business premises owned by Kasheef Murray after repeatedly kicking the front door. Thereafter, one of the invaders shot Kasheef Murray in the hip or groin area, fortunately causing limited damage, while others demanded that both victims hand over their casino winnings. During the robbery both victims were terrorized, beaten and their clothing forcefully removed, their winnings and personal belongings including Isiah Brown's wallet and identification. The apartment was ransacked in the process.

The Commonwealth of Pennsylvania soundly established beyond a reasonable doubt that in the early morning hours of February 27, 2015, the jointly tried defendants, Haneef Tuck, Aaron Brunson, along with two other males, forcibly invaded a tattoo parlor located at 1932 N. 31ᵗ Street and robbed business owner Kasheef Murray and his friend Isaiah Brown. On the night of February 26, 2015 and the early morning of February 27, 2015, victims Murray and Brown were gambling together at the Sugar House Casino in Philadelphia, where each won several hundred dollars (N.T. 5/17/16, pp. 76-78). Appellant Haneef Tuck and co-defendant Aaron Brunson were also at the casino, along with Sharique Orr and Ernest Myers, and had observed the victims win money (N.T. 5/18/16, pp. 49, 119-21).

Around 4:17 a.m. on February 27, 2015, after observing the complainants win money at the casino, Appellant and his co-conspirators followed complainants out of the casino (N.T. 5/17/16, pp. 79-80; 5/18/16, pp. 69-72). Complainants took a cab to Murray's tattoo parlor in the area of 31st and Berks Street in the City and County of Philadelphia. While the men were back in the tattoo parlor, someone kicked in the front door and four men entered. Three out of four of them were wearing some handkerchief or shirt over their face to mask their identity and all four of them were allegedly armed with guns. Immediately upon forcibly entering the tattoo parlor,

18

one of the men shot complainant Murray in the hip. One of the intruders demanded the money that the men had won at the casino. The intruders stripped both victims of their clothing and took cash money, an iPhone, Murray's iPad and Brown's wallet. (N.T. 5/17/16, pp. 61, 76-87, 87-106, 110-24). After the attack, both victims were transported to Temple Hospital for immediate emergency treatment.

While in the emergency room, complainant Murray gave a statement to Officer Patrick Heron. At trial, Officer Patrick Heron (Badge #5205) testified as to what Murray had told him:

> **OFFICER HERON:** "He told me that... he was at the casinos earlier. And after the casinos, him and his buddies went to a tattoo parlor on North 32nd Street to chill out afterwards...While inside there he, all of a sudden, heard several kicks at the front door. Next, he stated that the front door opened up. Four black males armed with guns entered. They had red and white shirts on their face. One of the black males said, "Give up your winnings. Give up the money you won at the casino." Next thing that Mr. Murray knew, he heard a gunshot. He told me that the one male stole cash from him and an iPhone and an iPad -- iPod, I believe."

(Id. at 61). Later, when Detective Michael Rocks presented a photo array to Murray, he identified Appellant as one of the men from the casino. (N.T. 5/17/16, pp. 106-10; 5/18/16, pp. 152-54).

Based on Murray's statement, police obtained video surveillance from the Sugar House Casino. The video showed Appellant Tuck and co-defendant Brunson exiting the casino, then complainants Murray and Brown exiting the casino and entering a cab, followed by Orr and Myers exiting the casino and entering a white Ford. Shortly after Appellant and Brunson left the casino, the video displays a silver Jeep lingering in an overflow parking lot prior to Murray and Brown's cab leaving. (N.T. 5/18/16, pp. 69-79). Police also recovered video footage from a surveillance camera near the complainant Murray's tattoo parlor which showed a white Ford car and silver Jeep in the area around the time of the shooting robbery. (N.T. 5/18/16, pp. 83-84, 87-90).

19

Officer Jayson Troccoli, who had known Appellant and co-defendant Brunson from his district, identified the men from still photographs of the casino surveillance footage. (N.T. 5/18/16, pp. 47-50, 55, 80-81). Officer Troccoli located a silver Jeep Cherokee consistent with the vehicle depicted in the surveillance video and subsequently conducted an automobile stop. When he approached the driver's side of the vehicle, he recognized Brunson as the driver. While executing a search warrant, the police recovered complainant Brown's wallet from the Jeep. (N.T. 5/18/16, pp. 92-96). Following his arrest, Brunson gave a written confession to Detective Rocks in which he identified his co-conspirators. (N.T. 5/18/16, pp. 97-121; 5/19/16, pp. 24-40, 44-53).

After arresting Appellant, police obtained a search warrant for cell phone records, call logs, and cell site tower information for the phones recovered from Appellant and Brunson. (N.T. 5/18/16, p. 125). The call logs from the phone reflected that from 4:18 a.m. to 5:20 a.m. on the morning of the robbery, there were nine (9) separate phone calls between Brunson's phone and a phone number subscribed to Orr. (N.T. 5/18/16, pp. 126-28, 132). Historical cell site analysis also showed that the phones recovered from Appellant and Brunson were in the same general vicinity in areas of South Philadelphia and the area of the crime scene, from the period of 4:00 a.m. and 6:00 a.m. on the morning of the robbery. (N.T. 5/18/16, pp. 6-13, 15-16, 20-23, 102, 133-35).

After being arrested and arraigned for the charged relating to the violent shooting robbery, Appellant proceeded to a joint jury trial with co-defendant Brunson. During trial, the Commonwealth presented substantial corroborating evidence including hospital records, property receipts, interviews with complainants and co-defendants, surveillance footage, phone records, and testimony from the officers. At the conclusion of the trial, the jury found Appellant

20

Tuck guilty of the following charges: Aggravated Assault, Burglary, two counts of Robbery, and two counts of Conspiracy.

## III. ISSUES

In his counseled 1925(b) Statement, Appellant argues that the Court erred for (1) failing to grant his post sentence motion claiming the verdict was against the weight of the evidence; (2) failing to grant his motion to reconsider sentence as it was unduly harsh and excessive; and (3) giving an incorrect jury instruction regarding the use of [co-defendant] Aaron Brunson's statement to police.

## IV. DISCUSSION

On November 8, 2022, the Superior Court granted Appellant's PCRA petition, finding that counsel's failure to preserve any issues raised on direct appeal "completely foreclose[d]" appellate review for Tuck and, thus, constituted a "constructive denial of counsel." *Commonwealth v. Rosado*, 150 A.3d 425, 433 (Pa. 2016). The Court further stated that

> Such deficient stewardship amounts to "ineffective assistance of counsel *per se*." *Id. See Commonwealth v. Liston* (*Liston II*), 977 A.2d 1089, 1094 n.9 (Pa. 2009) (acknowledging counsel will "rarely be deemed to have been ineffective for failing to file [optional post-sentence motions] **except . . . when the claim involves the discretionary aspects of sentence or a challenge to a verdict on weight of the evidence grounds, claims which must be raised in the trial court to be preserved for purposes of appellate review**") (emphasis added). *See also Commonwealth v Halley*, 870 A.2d 795, 799 (Pa. 2005) ("The claim that denial of merits review on direct appeal on account of counsel's deficient stewardship constitutes prejudice is, for all intents and purposes, the functional equivalent of the presumed prejudice concept considered in *Lantzy*."); *Rosado*, 150 A.3d at 434 (holding that "the filing of an appellate brief which abandons all preserved issues in favor of unpreserved ones constitutes ineffective assistance of counsel *per se*").[emphasis in the original]

Having found that Appellant's counsel *completely* forfeited any merits review of his claims on direct appeal, the Superior Court deemed counsel ineffective *per se* and, reversed this

21

Court's order denying PCRA relief, reinstated Tuck's right to file post-sentence motions *nunc pro tunc* and remanded the matter for further proceedings. *Lantzy, supra*; *Rosado, supra*.

## 1. Weight of the Evidence

As his post-sentence motion was denied, Appellant argues that this Court erred in not granting his post-sentence motion challenging the weight of the evidence. He also argues that the verdict was against the weight of the evidence. This argument fails as the Commonwealth presented compelling and sufficient evidence of Appellant's involvement in the robbery and assault of both complainants; the Commonwealth presented sufficient evidence to sustain Appellant's convictions.

Appellant claims that the verdict was against the weight of the evidence because the evidence was only sufficient to establish that he was near the incident, not that he did anything further than "be at the wrong place at the wrong time" (Post-Sentence Motion, p. 4; Amended Petition, p. 13). Contrary to Appellant's claim, the verdict in this case was supported by sufficient evidence and does not shock one's sense of justice. Any claim on appeal that the verdict was against the weight of the evidence would have failed.

"The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none [,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa. Super. 2000). It is well-settled that the court cannot substitute its judgment for that of the trier of fact. *Talbert, supra* at 546. "In order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (internal quotation marks and

citation omitted). As our Supreme Court has made clear, reversal is only appropriate "where the facts and inferences disclose a palpable abuse of discretion[.]" *Commonwealth v. Morales*, 91 A.3d 80, 91 (Pa. 2014) (citations and emphasis omitted).

A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions the evidence that the jury chose to believe. *Commonwealth v. Thompson*, 106 A.3d 742, 758 (Pa. Super. 2014). For that reason, the trial court need not view the evidence in the light most favorable to the verdict winner and may instead use its discretion in concluding whether the verdict was against the weight of the evidence. *Commonwealth v. Widmer*, 744 A.2d 745, 751 n.3 (Pa. 2000). A defendant cannot properly ask an appellate court to substitute its assessment of credibility for the fact finder's. *Commonwealth v. Stiles*, 143 A.3d 968, 981 (Pa. Super 2016). Consequently, a challenge to the trial court's determination that the verdict was not against the weight of the evidence is "[o]ne of the least assailable reasons for granting... a new trial." *Commonwealth v. Sebolka*, 205 A.3d 329, 341 (Pa. Super. 2019)(*quoting Widmer*, 744 A.2d at 753).

In the instant matter, Appellant claims that the only credible witness evidence was the initial police report taken by Officer Patrick Heron while Murray was in a traumatized, intoxicated state. Appellant claims that because Murray did not corroborate his initial identification and some of his statement at trial, Murray's trial testimony "does not provide a consistent factual basis" to prove that the events alleged in the statement occurred. (Post-Sentence Motion, p. 4; Amended Petition, p. 12). Contrary to Appellant's claim, Murray gave a subsequent written statement to Detective Rocks and testified at a grand jury proceeding. His testimony both times was consistent with his original statement. (N.T. 5/17/16, pp. 87-124; 5/18/16, pp. 64-66). Although Murray did not identify Appellant at trial and did not recall

whether he was previously shown a photo array, Detective Edward Keppol testified that Murray identified Appellant in a photo array as one of the men he saw at the casino. (N.T. 5/18/16, pp. 132-33, 152-57).

Not only did Murray identify Appellant multiple times, but his identification was corroborated by other evidence. Evidence included (1) a surveillance video showing co-defendant Brunson and others with Murray and Brown at the casino, (2) the recovery of Brown's leather wallet from Brunson's Jeep, and (3) the cell phone tower data analysis. (N.T. 5/18/16, pp. 68-77, 94, 106-08; 5/19/16, pp. 24, 30-31). Based on the multiple statements and later corroborating evidence, the jury's decision to credit Murray's earlier statement would be reasonable and does not shock the conscience. See *Commonwealth v. Brady*, 507 A.2d 66 (Pa. 1986 (prior inconsistent statements admissible for impeachment purposes); see also *Commonwealth v. Lively*, 610 A.2d 7 (Pa. 1992) (prior inconsistent statements admissible as substantive evidence).

Appellant also claims that the video evidence did not show him entering Brunson's Jeep at the casino, nor did it show him in the area of Murray's tattoo parlor the night of the incident. Appellant claims that officials "assumed that [he] was also present." (Post-Sentence Motion, p. 4; Amended Petition, p. 13). However, Appellant was seen on surveillance video with Brunson at the casino and was also seen leaving the casino shortly after complainants. (N.T. 5/18/16, pp. 68-77; 5/19/16, p. 52). Later on the night of the incident, a Jeep consistent with that of Brunson's was seen in the area of the crime scene. (N.T. 5/18/16, pp. 83-84, 87-90).

Additionally, historical cell site analysis confirmed that Appellant's cell phone was in the area of both the casino and the tattoo parlor on the night of the incident at relevant times. (N.T. 5/18/16, pp. 6-16, 20-23, 102, 133-35). Contrary to Appellant's assertion that the cell site data

only indicates that he was only innocently in the area of the incident, such circumstantial evidence presented at trial indicates Appellant's involvement in the criminal activity. Complainant Murray stated that the four men who broke into the tattoo parlor referenced the money that he had just won at the casino, and video surveillance clearly shows that Appellant was one of the men at the casino with them. (N.T. 5/18/16, pp. 68-77, 106-08; 5/19/16, pp. 24, 30-31). Based on the totality of the evidence, the jury reasonably concluded that Appellant was part of the conspiracy to commit robbery. Given the overwhelming and compelling evidence presented at trial, a claim challenging the weight of the evidence fails.

## 2. Reconsideration of Sentence

Appellant next claims that this Court erred in denying his motion to reconsider his sentence. He argues that his sentence was harsh and unreasonable and imposed under a false narrative of what happened. (Post-Sentence Motion, p. 5; Amended Petition, p. 16). Despite Appellant's argument to the contrary, had trial counsel filed a motion to reconsider sentence it would have been denied for the reasons set forth in the Trial Court Opinion, June 12, 2018, pp. 18-24).[1]

---

[1] The relevant portion of the Court's June 12, 2018 Opinion is as follows:

Appellate review of this matter begins with the statutory prescription contained within 42 Pa. C.S.A. § 9781(b) which directs that an appeal may be granted at the discretion of the appellate court only where it appears that there is a substantial question that the sentence imposed is not appropriate under this chapter. Thus, with regard to the discretionary aspects of the sentencing, there is no automatic right to appeal. See *Commonwealth v. Cook*, 941 A.2d 7 (Pa. Super. 2007). The Defendant does not have a valid claim of excessive sentence without including an additional and more specific violation of the sentencing code. Only when a sentencing claim sets forth the manner in which either a particular provision of the Sentencing Code or an underlying fundamental norm of the sentencing process was violated, does a claim of excessiveness present a substantial question. *Commonwealth v. Mouzon*, 812 A.2d 617, 620 (Pa. 2002). A blanket claim of excessiveness, with no further allegations, does not create a substantial question. *Id.*

Moreover, within this Commonwealth, the "imposition of a sentence is vested in the discretion of the sentencing court and will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996). This standard reflects that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Ward*, 524 Pa. 48, 568 A.2d 1242, 1243 (1990). Consistent with this standard of record review, the appellate court shall have regard for: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and ... (3) the findings upon which the sentence was based." 42 Pa. C.S.A. § 9781 (d) (1) and (3).

As the instant record of the respective hearings conducted, this Court succinctly identified its thorough incorporation and evaluation of all relevant factors. Both parties and their through their respective attorneys agreed with this Court's announced determination that the guidelines promulgated by the Pennsylvania Commission of Sentencing classified the Offense Gravity Score for each offense, excepting Burglary, was a "10" and that Appellant's computed Prior Record Score was a "4", due to his previous convictions. Similarly, on the record, both counsel agreed that the guideline sentence range recommended for each offense, excluding Burglary, was for a state term of confinement of forty-eight (48) months to sixty (60) months with a possible deviation upward or downward of twelve (12) months.

It was further acknowledged that the offense gravity score for the crime of Burglary was graded one point less than the other offenses, and that the calculated guideline standard range was thirty-six (36) months to forty-eight (48) months of confinement with possible deviation of twelve (12) months upward or downward. (N.T., 07/22/2016, pp. 4-8). The imposed sixty (60) month minimum period of confinement for each offense for which Appellant had been convicted fell within the standard range for all offenses except the Burglary charge which placed the imposed sentence within the aggravated range.

At the sentencing hearing, this Court considered testimony offered by Appellant's biological maternal aunt and adoptive mother, Patricia Cheeseboro. Ms. Cheeseboro told this Court that she adopted Mr. Tuck and his siblings when they were very young and that all of her children went to church and did well in school, including Mr. Tuck who she identified as an "A student." (N.T. 7/22/16, p. 14). Ms. Cheeseboro stated that despite his good upbringing, Mr. Tuck "made some very bad decisions." (Id. at 16). After hearing arguments from both sides, this Court carefully weighed various pertinent factors to arrive at Mr. Tuck's sentence.

Having previously directed the completion of Presentence and Investigative Reports from the Philadelphia Probation Department and Mental Health Evaluation by the First Judicial District Mental Health Unit on the date of entry of jury verdicts, this Court incorporated and referenced thorough consideration of the data contained within each assessment. (N.T. 07/22/2016 p. 6). This Court acknowledged that while Mr. Tuck faced many difficulties during his tender formative years, his aunt Ms. Cheeseboro had adopted him at a very early age and properly raised him in a loving healthy household. By all accounts, Haneef Tuck had apparently and drastically departed from the guidance he had received and squandered his intelligence and educational opportunities that had been provided including college level education at Cheyney University to actively pursue daily employment dealing crack cocaine and violent gang involvement (Id. at 22, 23).

As noted on the record, Haneef Tucks' history of illegal narcotic usage and corner dealing began at the early age of thirteen years and continued without cessation excepting,

possibly, any periods of incarceration. Mr. Tuck bragged to the interviewing presentence investigator that since the age of fifteen he had earned approximately one thousand dollars per week from the illegal distribution of marijuana, heroin, and crack cocaine. Similarly noted and incorporated into the transcribed record, Appellant rebuffed all previous efforts to rehabilitate him in addition to ignoring the guidance of Ms. Cheeseboro As a juvenile he was arrest once and was granted dependency assistance. As an adult, he was arrested ten times resulting in seven case convictions and committed to four placements predominantly focused upon reported illegal use of narcotics. His multiple arrests continued through the years well after being placed in the Alternative Rehabilitation Diversionary (ARD) program at the age of eighteen years following his arrest for possession of illegal narcotics.

Between the age of eighteen and twenty, he had been granted twelve months of probation without verdict in two subsequent narcotics possession cases and graduated his illegal efforts to include narcotic felony level narcotics dealing, theft, and providing false identification to law enforcement,. Court ordered periods of probation and county confinements had little effect upon Haneef Tuck because he continued to be arrested until the age of twenty five-years when he was arrested in the instant matter.

Within relatively short periods, Appellant had incurred four violations of his probation or parole periods of supervision resulting in four revocations of respective sentences imposed by prior courts. Appellant had been discharged from the supervision of the Philadelphia District Attorney's Focused Deterrence Program because he violated the rules of supervision. He had been unsuccessfully discharged from the outpatient program within two months after referral to Wedge Medical Center in 2013. While under supervision of the First Judicial District of Pennsylvania's Adult Probation and Parole Department, Appellant had tested positive eight occasions for marijuana, opiates, benzodiazepine, and cocaine. He had reported to the presentence investigator he denied use of cocaine and claimed that the substance had entered his blood system through his "pores" during his distribution "bagging" efforts.

Appellant's remorseless, merciless and increasingly violent conduct were acknowledged by this Court as strikingly salient sentencing factors. This Court remarked that this case presented "one of the most predatory examples of behavior" observed to date. (Id. at 23). Accordingly, this Court reasonably concluded that Haneef Tuck was a "clear and present danger to the community... and particularly to the complainants." (Id. at 24). After conducting a thorough incorporation an evaluation of all relevant sentencing factors, this Court recorded sufficient justification for the sentence imposed on each offense.

Similarly, pursuant to 42 Pa. C.S.A. § 9781(d)(1) and (3), this Court was well within its discretionary right to impose the sentences consecutively. The sentencing court's exercise of discretion by imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal in our Commonwealth. *Commonwealth v. Marts*, 889 A.2d 608 (Pa. Super. 2005).

In the instant matter, individualized consecutive standard sentences upon Appellant were imposed only after careful consideration of all relevant sentencing factors including the paramount need for protection of the public, the gravity of the offense, and Appellant's poor prospect of rehabilitation. Thus, Appellant has not raised any substantial question that the consecutive sentences imposed were inappropriate or contrary to a fundamental norm underlying the sentencing code.

27

Within this Commonwealth, the "imposition of a sentence is vested in the discretion of the sentencing court and will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996). This standard reflects that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Ward*, 524 Pa. 48, 568 A.2d 1242, 1243 (1990). Consistent with this standard of record review, the appellate court shall have regard for: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and ... (3) the findings upon which the sentence was based." 42 Pa. C.S.A. § 9781 (d) (1) and (3). Reasonableness of a sentence is based in part on the

Additionally, the weight given by the Court to the individual relevant sentencing factors is not a substantial question because this simply raises a disagreement about this Court's determination of facts and the weight of factors. Again, the sentencing court is given broad discretion in formulating a sentence, with no automatic right of review available. *Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. Ct. 2010). An appeal can only be granted if there is a substantial question as to a violation of a specific sentencing code or a fundamental norm. 42 Pa. C.S.A. § 9781; *Mouzon*, 812 A.2d at 627.

Even if the reviewing court found a substantial question, the sentencing court's determination can only be overturned for an abuse of discretion. *Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007). Such an abuse is not just a mere disagreement. *Id.* It must be "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." *Id.* This standard is embodied in the language of section 9781(c), which dictates that when sentencing outside the guidelines, a sentencing court's determination must stand unless the sentence was unreasonable. 42 Pa. C.S.A. § 9781(c).

A sentence is reasonable when it includes examination of the public protection, the crime's gravity, and the defendant's rehabilitative needs, as listed in section 42 of the Pennsylvania Code. 42 Pa. Cons. Stat. Ann. § 9721 (West); *Walls*, 926 A.2d at 964. Additionally when the sentencing court has reviewed a presentence report, it is presumed that the court has considered the information it contains. *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. Ct. 2004) *aff'd* 891 A.2d 1265 (Pa. 2006). Facts can be considered, pursuant to § 9721(b)'s sentencing requirements, even if the facts are subsumed within the guideline recommendation. *Commonwealth v. Sheller*, 961 A.2d 187, 192 (Pa. Super. Ct. 2008).

It was well within this Court's discretion to impose consecutive sentences for five of the six first degree felony offenses for which he had been convicted. Each offense possesses different statutory elements and addressed separate societal values and impact upon two different victims. As the instant record reflects, when sentencing Mr. Tuck, this Court incorporated the gravity of the premeditated Burglary, Aggravated Assault, and Robbery as well as Appellant's criminal history, rehabilitative needs, and his squandered opportunities he had been provided.

nature and circumstances of the offense and the history and characteristics of the defendant. *Commonwealth v. DiClaudio*, 210 A.3d 1070, 1076 (Pa. Super 2019) (citing 42. Pa. C.S.A. $ 9781(d)).

Here, Appellant does not allege, nor could he, that his sentence fell outside guideline range. Rather, Appellant claims that his sentence was harsh and unreasonable. He first contends that the Court did not give sufficient attention to credible character evidence showing that Appellant is capable of being a positive community member, including testimony from the woman who raised him, Patricia Cheeseboro (Post-Sentence Motion, p. 5; Amended Petition, p. 17). The record belies this allegation, as this Court explicitly acknowledged the testimony of Ms. Cheeseboro and the role she played in Appellant's life: "I do acknowledge that there were many difficulties in your early life ... But Ms. Cheeseboro raised you better. You chose otherwise." (N.T. 7/22/16, p. 22). Information about Appellant's childhood was also contained in Appellant's sentence report presumed that the court has considered the information in it. *Commonwealth v. Finnecy*, 135 A.3d 1028, 1038 (Pa. Super. 2016) (*citations omitted*). Therefore, this Court did consider the character evidence presented on behalf of the Appellant and concluded that he had potential and had multiple ways to go, but chose a criminal path (N.T. 7/22/16, p. 24). Moreover, Appellant's claim fails to consider the other relevant factors considered by the Court, including association with the 18th Street gang, prior performance while under supervision of the Philadelphia District Attorney's focused deterrence project, and a long history of selling narcotics since the age of 15, including prior convictions and probation and parole revocations. (N.T. 7/22/16, pp. 22-24).

Appellant also claims that considering the information presented at trial, Appellant was committed to nothing more than a poor choice in companions. (Post-Sentence Motion, p. 6;

Amended Petition, p. 17). In this, Appellant seeks to supplant the evidence presented at trial with his own version of events. The evidence at trial demonstrated Appellant's active role in the conspiracy. In issuing its sentence, this Court emphasized the predatory nature of the behavior and concluded that Appellant presented a danger to the city and community as well as the complainants in the case (N.T. 7/22/16, pp. 22, 24).

Finally, Appellant claims that the recommended sentence sought by the Commonwealth was unreasonable because it exceeded the recommended sentence (Post-Sentence Motion, p. 5; Amended Petition, p. 16). It is of no consequence that the Court's sentence exceeded that requested by the Commonwealth because the decision to impose a sentence rest within the discretion of the court, including the decision to impose consecutive sentences. *See* 42 Pa. C.S.A § 9781(d). In sum, Appellant's post sentence motion to reconsider sentence was denied because this Court considered all relevant factors at the time of sentencing. *See* footnote 1; Trial Court Opinion, June 12, 2018, pp. 18-24. As such, this argument fails.

### 3. <u>Incorrect Jury Instruction</u>

Finally, Appellant argues that this Court erred in giving an incorrect jury instruction. According to Appellant, this Court correctly instructed the jury that the statement made by co-defendant Brunson to the police could not be used or considered against Appellant, however, Appellant argues that the Court allegedly erred when it instructed the jury that they could accept as true everything that was contained in the statement without qualifying the instruction to ensure that the jury continued to understand that the stamen could not be used against Appellant.

When reviewing a challenge to a jury instruction, an appellate court must review the charge as a whole." *Commonwealth v. Spotz*, 759 A.2d 1280 (Pa. 2000); *see also Commonwealth v. Jones*, 683 A.2d 1181 (Pa. 1996). An appellate court will uphold an instruction if it adequately

and accurately reflects the law and is sufficient to guide the jury through its deliberations. *Id.* citing *Commonwealth v. Ahlborn*, 657 A.2d 518, 520 (Pa. Super. 1995). Error will not be predicated on isolated excerpts. Instead, it is the general effect of the charge that controls. *Id.* citing *Commonwealth v. Zewe*, 663 A.2d 195, 201 (Pa. Super. 1995), *appeal denied*, 675 A.2d 1248 (Pa. 1996). An erroneous charge warrants the grant of a new trial unless the reviewing court is convinced beyond a reasonable doubt that the error is harmless. *Id.*

In the instant matter, numerous previous inconsistent statements had been introduced in some form or fashion predominantly concerning those by Kasheef Murray. This Court in response duly provided the jury with the accepted general instruction that prior inconsistent statements may be introduced to assert truth as contained within in the earlier statement of a witness. This Court, however, succinctly informed the jury that use of Aaron Brunson's post-Miranda statement that he had given to the assigned investigator after arrest was restricted by saying that signed statement of admission could only be used against Aaron Brunson. Moreover, this Court specifically instructed the jury that Aaron Brunson's post-Miranda statement of admission could not be used against Appellant Haneef Tuck. (N.T. 5/20/16, pp. 21-22). Appellant argues however that the Court should have reiterated the restriction of using Brunson statement as not doing so was contradictory, and prejudicial because it left the jury with "conflicting instructions that allowed them to draw negative inferences" that "were not supported by the record, evidence, or testimony"

When reviewing a challenge to a jury instruction, an appellate court must review the charge as a whole." *Commonwealth v. Spotz*, 759 A.2d 1280 (Pa. 2000); *see also Commonwealth v. Jones*, 683 A.2d 1181 (Pa. 1996). An appellate court will uphold an instruction if it adequately and accurately reflects the law and is sufficient to guide the jury through its deliberations. *Id.*

31

citing *Commonwealth v. Ahlborn*, 657 A.2d 518, 520 (Pa. Super. 1995). Error will not be predicated on isolated excerpts. Instead, it is the general effect of the charge that controls. *Id.* citing *Commonwealth v. Zewe*, 663 A.2d 195, 201 (Pa. Super. 1995), *appeal denied*, 675 A.2d 1248 (Pa. 1996). An erroneous charge warrants the grant of a new trial unless the reviewing court is convinced beyond a reasonable doubt that the error is harmless. *Id.*

Here, co-defendant Brunson's statement to police was initially entered into evidence as part of the Commonwealth's case-in-chief through the testimony of Detective Michael Rocks (N.T. 5/18/16, pp. 97-1210. At that time, the statement was redacted according to the holding of *Bruton v. United States*, 391 U.S. 123 (1968), which requires the sanitization of a defendant's name in a statement given by a non-testifying co-defendant. Following the conclusion of the Commonwealth's case, co-defendant Brunson elected to testify, and thus opened the door for the entire, unredacted statement to be entered into evidence. In his testimony, co-defendant Brunson stated that he left the casino and went directly home. He further denied giving a statement to police and stated that the signature on his statement was not his. In rebuttal to co-defendant Brunson's testimony, the Commonwealth entered the unredacted statement through the testimony of Detective Rocks as both impeachment and substantive evidence. (N.T. 5/19/16, pp. 44-53); Pa.R.E. 803.1(1) to stand as (prior inconsistent statement admissible as substantive evidence).

In this case, Aaron Brunson took the stand at trial and as such his trial testimony, and his previous statements became fair game for the jury's consideration of the evidence concerning both Haneef Tuck and Aaron Brunson. Aaron Brunson was available for cross-examination efforts by the Commonwealth and on behalf of Haneef Tuck. This Court gave multiple instructions about co-defendant Brunson's statement and how the jury could evaluate and use the statement. Prior to the cross-examination of Brunson by the Commonwealth, and again in its

32

charge, this Court gave an instruction to the jury about why a non-redacted version Brunson's statement was introduced after the introduction of the redacted version. (N.T. 5/19/16, pp. 25-26; 5/20/16, pp. 21-22). Furthermore, this Court clearly stated that the statement made by Mr. Brunson only applies to Mr. Brunson. The jury was specifically instructed that the statement could not be used against Appellant. Despite Appellant's assertion to the contrary:

> **THE COURT:** "Getting back to how we use and introduce Mr. Brunson's statement. Alleged statement. I explained to you before that the reason C-24 was introduced, which was the defendant's alleged statement that was redacted or amended, had certain parts that were not in it. Those certain parts referred to, allegedly, Mr. Tuck. You were given the redacted form initially by the Commonwealth in its case for important rules of law. And one of the rules of law that was at issue is as follows: It's how do you use that statement when you have two defendants sitting together? So one of the rules is that rule restricts the use of the evidence offered to show that Mr. Brunson made a statement concerning the crime charged. A statement made before trial may be considered as evidence only against the defendant who made the statement. That's Mr. Brunson. Thus, you may consider the statement as against the defendant Mr. Brunson if you believe that he made the statement voluntarily. You must not consider that statement as evidence against the defendant Mr. Tuck or any other defendants. There's only two here. You must not use the statement in any way against Mr. Tuck."

(N.T. 5/20/16, p. 21-22).

Ultimately, these instructions limited the jury further than legally necessary and gave Appellant a benefit that he was not legally entitled to. When a co-defendant elects to testify, any Confrontation Clause or *Bruton* issues are eliminated for the non-testifying defendant. *See Nelson v. O'Neil*, 402 U.S. 622, 629-30 (1971) ("[W]here a co-defendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments."); *Commonwealth v. Wheeler*, 645 A.2d 853, 857 (Pa. Super. 1994). Thus, when Brunson took the stand, his prior inconsistent statement could be admitted in an unredacted form. The statement could also be

used substantively against both Appellant and Brunson. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("[W]here two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand."). Just like the prior inconsistent statement of any other witness, Brunson's statement was admissible for the impeachment of Brunson and admissible as substantive evidence against Appellant and Brunson. *See Commonwealth v. Brady*, 507 A.2d 66 (Pa. 1986) (prior inconsistent statements admissible for impeachment purposes); *Commonwealth v. Lively*, 610 A.2d 7 (Pa. 1992) (prior inconsistent statements admissible as substantive evidence).

Thus, this Court did not need to give an additional restrictive instruction about the use of Brunson's statement, limiting it only to Brunson, but did so because trial counsel requested the instruction (N.T. 5/19/16, p. 71). Because the jury is presumed to have followed this Court's instructions and considered Brunson's statement only against Brunson and not against Appellant, Appellant was not prejudiced by the instruction. A claim on direct appeal challenging the instruction would not have entitled Appellant to relief as this Court went further than necessary to preclude the jury from considering admissible inculpatory evidence against Appellant. (N.T. 5/20/16, pp. 21-24).

## VI. CONCLUSION

In summary, this Court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Appellant's request for relief in this case. For the reasons set forth above, Appellant's post sentence motion was properly denied.

BY THE COURT:

ANNE MARIE B. COYLE, J.

34